# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP32-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>          Plaintiff-Respondent,<br>     v.<br>Oscar C. Thomas,<br>          Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 277, 963 N.W.2d 887
PDC No: 2021 WI App 55 - Published

| | |
|---|---|
| OPINION FILED: | February 21, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 28, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Kenosha |
| JUDGE: | Bruce E. Schroeder |

JUSTICES:
ROGGENSACK, J., announced the mandate of the Court, and delivered an opinion, in which ZIEGLER, C.J., joined, and the majority opinion of the Court with respect to ¶2 and ¶¶12-24, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, DALLET and KAROFSKY, JJ., joined, and in which HAGEDORN, J., joined with respect to ¶¶12-24. DALLET, J., filed a concurring opinion, which constitutes the majority opinion of the Court, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion.
NOT PARTICIPATING:

ATTORNEYS:

     For the defendant-appellant-petitioner, there were briefs filed by *John T. Wasielewski* and *Wasielewski & Erickson,* Milwaukee. There was an oral argument by *John T. Wasielewski.*

     For the plaintiff-respondent, there was a brief filed by *Sonya K. Bice,* assistant attorney general, with whom on the

brief was *Joshua L. Kaul,* attorney general. There was an oral argument by *Sonya K. Bice,* assistant attorney general.

2023 WI 9

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP32-CR
(L.C. No. 2007CF1)

STATE OF WISCONSIN          :        IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Oscar C. Thomas,**

    **Defendant-Appellant-Petitioner.**

**FILED**

**FEB 21, 2023**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, J., announced the mandate of the Court, and delivered an opinion, in which ZIEGLER, C.J., joined, and the majority opinion of the Court with respect to ¶2 and ¶¶12-24, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, DALLET and KAROFSKY, JJ., joined, and in which HAGEDORN, J., joined with respect to ¶¶12-24. DALLET, J., filed a concurring opinion, which constitutes the majority opinion of the Court, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, J. We review a published decision of the court of appeals[1] that affirmed the circuit

---

[1] State v. Thomas, 2021 WI App 55, 399 Wis. 2d 277, 963 N.W.2d 887.

court's[2] judgment of conviction and its denial of Oscar C. Thomas's postconviction motion.

¶2 We accepted two issues for review. First, whether Thomas's confession of sexual assault was corroborated by a significant fact, and we conclude it was. This opinion is the majority opinion for the discussion of corroboration. Second, whether the cross-examination of Thomas's expert witness by use of a Wisconsin Crime Lab Report ("the Report") that was not in evidence and whose author did not testify violated Thomas's confrontation right. Four justices conclude the Report's contents were used for their truth during cross-examination, thereby violating Thomas's right of confrontation. Justice Dallet's concurrence is the decision of the court for the confrontation issue.[3] Six justices conclude Hemphill precludes admission of evidence to correct an allegedly misleading impression created by the defendant, and seven justices conclude that any error related to the Report was harmless. Accordingly, we affirm the court of appeals.

¶3 The court of appeals concluded that the State met its evidentiary burden to sufficiently corroborate Thomas's confession of sexual assault. We agree with this conclusion. We also conclude that the State's use of the Report[4] that a

_____

[2] The Honorable Bruce E. Schroeder of Kenosha County Circuit Court presided.

[3] Justice Dallet's concurrence is joined by Justices Ann Walsh Bradley, Rebecca Grassl Bradley and Jill J. Karofsky.

[4] The Report, a three-page document, was marked as Exhibit 36 during the prosecutor's cross-examination of Thomas's expert,

2

defense expert reviewed, but which was not admitted into evidence, did not violate Thomas's confrontation right under the United States' Constitution or the Wisconsin Constitution when used for impeachment purposes.[5] However, we reject the State's argument that it properly used the Report's contents during closing argument. Furthermore, following Hemphill,[6] a criminal defendant does not "open the door" to the introduction of testimonial out-of-court statements for the purpose of "correct[ing]" a "misleading impression." Although we conclude that the State did not use the content of the Report for its truth on cross-examination, the State did improperly use the Report's content for its truth during closing argument, which the circuit court erroneously permitted. However, we conclude the error was harmless because it is "clear beyond a reasonable doubt that a rational jury would have found [Thomas] guilty absent the error." State v. Harvey, 2002 WI 93, ¶46, 254 Wis. 2d 442, 647 N.W.2d 189 (citing Neder v. United States, 527 U.S. 1, 18 (1999)).

---

Dr. Williams. The prosecutor did not attempt to have Exhibit 36 admitted.

[5] U.S. Const. amend VI; Wis. Const. art. I, § 7.

[6] Hemphill v. New York, 595 U.S. ___, 142 S. Ct. 681, 686 (2022). We acknowledge that Hemphill was published while this case was pending on appeal.

3

## I. BACKGROUND

¶4 In the early hours of December 27, 2006, officers responded to a 911 call and found Ms. Joyce Oliver-Thomas unresponsive on the floor of her apartment. Emergency responders employed CPR and attempted to resuscitate Ms. Oliver-Thomas as they transported her to the hospital, where she was pronounced dead. An autopsy concluded that Joyce died from "Strangulation due to Physical Assault." Ms. Oliver-Thomas's husband, the defendant Oscar C. Thomas,[7] was subsequently charged with first-degree intentional homicide, first-degree sexual assault, and false imprisonment. Thomas provided three statements to police over the course of the investigation, which we address below.

¶5 At his 2007 trial, the jury convicted Thomas of all three charges against him. Thomas appealed, and the court of appeals affirmed. We denied review.[8] Thomas then pursued federal habeas corpus relief, and the Seventh Circuit granted him a new trial. Thomas v. Clements, 789 F.3d 760 (7th Cir.

---

[7] The record indicates that Thomas and Ms. Oliver-Thomas had been married, divorced, and then reconciled without remarrying. Accordingly, Thomas refers to Ms. Oliver-Thomas as his wife. Striving for consistency with the record, we too, refer to Ms. Oliver-Thomas and Thomas as spouses, though we recognize this was not technically the case at the time of Ms. Oliver-Thomas's death.

[8] State v. Thomas, No. 2010AP1606-CR, unpublished slip op., ¶1 (Wis. Ct. App. Nov. 9, 2011), review denied, 2012 WI 45, 340 Wis. 2d 542, 811 N.W.2d 818.

2015).[9] Thomas was retried to a jury in 2018, convicted of all charges again, and was sentenced to life imprisonment.

¶6 Thomas appealed, and the court of appeals affirmed Thomas's convictions and the circuit court's denial of his postconviction motions. Specifically, the court of appeals concluded there was sufficient corroborating evidence of the sexual assault confession, and denial of the postconviction motion was appropriate. State v. Thomas, 2021 WI App 55, ¶14, 399 Wis. 2d 277, 963 N.W.2d 887. The court of appeals also concluded the Report's DNA evidence was "inadmissible hearsay," causing a Confrontation Clause violation when it was used erroneously during trial and during the State's closing argument. Id., ¶35. However, the court of appeals concluded that the error was harmless. Id., ¶¶35, 37.[10]

¶7 In its briefing to us, the State did not argue that the Report could be used for the truth of its contents. Rather,

---

[9] Thomas argued his 2007 trial counsel was ineffective because he failed to call a forensic pathologist or other similar expert to refute the State's forensic pathologist's testimony. Thomas v. Clements, 789 F.3d 760, 762-63 (7th Cir. 2015). The court of appeals agreed that failure to call a forensic expert demonstrated the deficiency of Thomas's counsel and prejudiced his defense. Id. at 763. The Seventh Circuit concluded "that a reasonable counsel would have consider[ed] and/or consulted with a forensic expert," and "[g]iven the weakness of the state's case . . . there is a reasonable probability the outcome of the trial would have turned out differently." Id.

[10] Thomas presented a third issue to the court of appeals regarding an allegedly-biased juror, which he has not petitioned for us to review.

5

it set the issue up as: "[W]hen Thomas's expert gave testimony directly contradicting the lab report on which he relied, it was an implied waiver of Thomas's right to confront the author of the lab report." However, Dr. Williams did not say he "relied" on the Report, but rather, that he "reviewed" the Report along with hundreds of other pages of material relative to this case.[11] Nevertheless, the State veered from the argument it raised consistently below that the prosecutor used the Report to impeach Thomas's defense expert. Instead, at oral argument the State argued that we should analyze the Report based on the contention that its contents were properly used during cross-examination and during closing argument for the truth of the matters asserted therein.

¶8 Thomas petitioned us for review, which we granted on two matters: first, to review whether the State sufficiently satisfied its burden to corroborate Thomas's confession with any significant fact; second, to review whether the State's cross-examination of Thomas's expert witness through the use of the Report violated Thomas's right under the Sixth Amendment to confront the author of the Report. We also review the State's use of the DNA findings of the Report in the prosecutor's closing argument. We conclude that error occurred in the

---

[11] Prosecutor: "Now, you also reviewed Wisconsin crime lab reports, correct?"

Answer: "Correct."

6

prosecutor's use of the contents of the Report in closing argument; however, the error was harmless as we explain below.

## II. DISCUSSION

### A. Standard of Review

¶9 Whether evidence corroborates a criminal defendant's confession(s) or statement(s) presents a question of evidentiary sufficiency, which is ultimately a question of law subject to our independent review. State v. Bannister, 2007 WI 86, ¶¶22, 33, 302 Wis. 2d 158, 734 N.W.2d 892.

¶10 We review constitutional issues independently, although we benefit from the discussions of the court of appeals and circuit court. State v. Smith, 2012 WI 91, ¶25, 342 Wis. 2d 710, 817 N.W.2d 410.

¶11 Lastly, we review whether an error was harmless by placing the burden on the party that benefitted from the error to establish it is "clear beyond a reasonable doubt that a rational jury would have found [Thomas] guilty absent the error." Harvey, 254 Wis. 2d 442, ¶46 (citing Neder, 527 U.S. at 18).

### B. Corroboration

¶12 Thomas first argues that the State did not present evidence to corroborate the statements he made to police in which he confessed to the crime of sexual assault. Accordingly, Thomas argues the jury convicted him based solely on the two

relevant statements he made to police following Ms. Oliver-Thomas's death.[12]

¶13 In Thomas's first statement to officers, he reported that Ms. Oliver-Thomas had complained of chest and ear pain in the early evening. Throughout the evening, Thomas and a friend were smoking crack in the basement of the four-plex apartment, and Thomas checked on his wife frequently. Each time he left the basement to check on Ms. Oliver-Thomas, she was "in bed dozing off." Thomas began watching a pornographic video in the apartment sometime after midnight, during which he became aroused and approached his wife, who agreed to consensual sex. During sex, the couple fell off of the bed and onto the floor. Following their encounter, Thomas noted that Ms. Oliver-Thomas complained her "chest was still hurting." Thomas checked on his wife a few more times, left the building and, upon returning to the apartment, he found Ms. Oliver-Thomas on the floor in the bedroom. Thomas then called 911 and administered CPR until officers arrived.

¶14 In Thomas's second statement to police,[13] he and a friend were smoking crack in the apartment building's basement.

---

[12] Thomas's third statement was made while he was in custody. The third statement implicated a drug dealer, who Thomas believes entered the apartment while Thomas was with his friend and killed Ms. Oliver-Thomas over an outstanding debt Thomas owed. As this statement is not relevant to the sexual assault conviction at issue, we do not address it further. See Thomas, 399 Wis. 2d 277, ¶6 n.3.

[13] Though not initially under arrest, Thomas was placed under arrest while providing his second statement to police. Officers read Thomas his Miranda rights (Miranda v. Arizona, 384

8

Thomas repeatedly returned to the apartment. On one trip to the apartment, Thomas noticed Ms. Oliver-Thomas was lying down because "her chest was hurting." On a subsequent trip upstairs, Ms. Oliver-Thomas said "she was feeling better." Thomas began watching a pornographic video and approached his wife to initiate sex. Even though she initially told him to stop, Thomas persisted, and, according to Thomas, the pair engaged in consensual sex, during which they fell to the floor. While engaged in sex, Thomas stated he had his left arm up around his wife's neck.

¶15 After Ms. Oliver-Thomas returned to the bed, Thomas said he began "humping" Ms. Oliver-Thomas's hip area. Thomas and Ms. Oliver-Thomas again fell to the floor, where Thomas had his left arm around Ms. Oliver-Thomas's neck a second time. Thomas stated:

> I didn't think I was squeezing hard, but Joyce was struggling and was yelling for me to stop and to quit it. Joyce's feet were kicking the floor while she was telling me to stop. Joyce was telling me she loved me and for me to quit playing. I kept squeezing for a little while . . . Joyce's breathing started to slow down, so I turned her loose. After I turned her loose, Joyce was breathing funny and looking at me. I got up and left [the apartment].

When Thomas returned, he found Ms. Oliver-Thomas laying face down on the floor. Thomas tried to lift her, but lost his grip twice. Each time, Ms. Oliver-Thomas's face hit the bed or the

U.S. 436 (1966)), which Thomas then waived to continue speaking with police.

9

floor. Thomas called 911, and the dispatcher instructed Thomas to begin CPR, which he performed until officers arrived.

¶16 The State charged Thomas with sexual assault pursuant to Wis. Stat. § 940.225(1)(a) (2021-22),[14] the conviction of which requires a jury to find beyond a reasonable doubt that a defendant had: (1) sexual contact with another person (2) without consent and (3) caused great bodily harm to that person. "Sexual contact" is statutorily defined to include intentional touching, either directly or through clothing, for the purpose of sexually arousing or gratifying the defendant.[15] The Jury Instructions at Thomas's trial adhered to the statutory language, and the jury convicted Thomas of first-degree sexual assault of Ms. Oliver-Thomas.[16]

¶17 Thomas asserts there was insufficient evidence to support his conviction for sexual assault independent of the statements he made to police. Namely, Thomas points to the results from Joyce's autopsy and forensic examination, which included the use of a sexual assault kit. The exam's results

---

[14] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

[15] See Wis. Stat. § 940.225(5)(b)1.

[16] The Jury Instructions at Thomas's trial adhered to the statutory language, stating, "Sexual contact includes the intentional touching of any part of the body of Joyce Oliver-Thomas by the defendant's penis. The touching may have been by the penis directly, or it may have been through the clothing. Sexual contact also requires that the defendant acted with intent to become sexually aroused or gratified."

did not reveal any evidence of sexual intercourse.[17] The State, however, alleged first-degree sexual assault consistent with Thomas's second statement to police. In that statement, Thomas confessed to "humping" Joyce's hip area, during which he had his left arm around Joyce's neck and he was squeezing. Joyce struggled and yelled at Thomas to stop, but Thomas "kept squeezing for a little while," until "Joyce's breathing started to slow down." Thomas let her go and noted "Joyce was breathing funny." Accordingly, evidentiary results of sexual intercourse from a forensic exam were not necessary to support the State's theory of sexual assault in this case.

¶18 One of the many tenets upon which our criminal justice system rests is that "conviction of a crime may not be grounded on the admission or confessions of the accused alone." State v. Verhasselt, 83 Wis. 2d 647, 661, 266 N.W.2d 342 (1978). Instead, Wisconsin law requires corroboration of any "'significant fact' in order to sustain a conviction." State v. Hauk, 2002 WI App 226, ¶20, 257 Wis. 2d 579, 652 N.W.2d 393. While at times we have upheld a jury's verdict of criminal conviction based on "considerable corroborative evidence," Verhasselt, 83 Wis. 2d at 662, Wisconsin's corroboration rule requires less than that. We have said:

> All the elements of the crime do not have to be proved independently of an accused's confession; however, there must be some corroboration of the confession in order to support a conviction . . . .

---

[17] R. 319 at 122-23.

11

> If there is corroboration of any significant fact, that is sufficient under the Wisconsin test.

Holt v. State, 17 Wis. 2d 468, 480, 117 N.W.2d 626 (1962). A significant fact is corroborated when "there is confidence in [] the fact that the crime the defendant has confessed to indeed occurred." Bannister, 302 Wis. 2d 158, ¶26. The primary purpose of the corroboration rule is to ensure the reliability of an accused's confession, requiring "evidence that the crime actually occurred." Id., ¶24; Hauk, 257 Wis. 2d 579, ¶24.

¶19 The State points to two pieces of evidence that, in its view, corroborate a "significant fact" of Thomas's confession of sexual assault: (1) a downstairs neighbor's testimony that she was woken by a loud argument upstairs, during which she heard a woman scream, "Stop, stop, I love you, I love you;" and (2) a pornographic video recovered at the apartment.

¶20 While the State does not, and need not, offer corroborating evidence of every element of the crime of sexual assault, the State has offered corroborating evidence for a "significant fact" of Thomas's statements given to police. Holt, 17 Wis. 2d at 480. Thomas's downstairs neighbor testified she heard an argument between a man and woman, and the woman screamed, "Stop, stop, I love you, I love you." The neighbor also testified she heard something big hit the floor, the sound of furniture moving, and silence. She then heard the apartment door open, and a person she identified as Thomas walked out.

¶21 We conclude the neighbor's testimony corroborates a "significant fact" of Thomas's statements to the police in which

12

he confessed to sexually assaulting his wife.  The neighbor heard a female voice scream "Stop, stop, I love you, I love you."  This phrase corroborates what Thomas told officers; namely, that while Thomas "humped" the victim's hip area, "Joyce was struggling and was yelling for me to stop . . . Joyce was telling me she loved me and for me to quit playing."[18]

¶22  The neighbor's testimony "permits confidence" that the crime of sexual assault that Thomas confessed to "indeed occurred."  Bannister, 302 Wis. 2d 158, ¶30.  Wisconsin's corroboration rule does not demand more to support a factfinder's determination of guilt when the only other evidence of a particular crime is the defendant's statements to officers. Holt, 17 Wis. 2d at 480.

¶23  We also conclude that the neighbor's testimony regarding Ms. Oliver-Thomas's statement establishes a "significant fact" consistent with our case law. See Bannister, 302 Wis. 2d 158, ¶2 (presence of morphine in an alleged buyer's body at time of death constituted a significant fact to corroborate confession); see also Holt, 17 Wis. 2d at 480-82 (charred infant torso found in furnace constituted sufficient independent corroboration of defendant's confession that baby was alive when placed in the furnace); Verhasselt, 83 Wis. 2d at

---

[18] While the State need not corroborate a confession with elements of a crime, we recognize, without deciding, Ms. Oliver-Thomas's statement may do just that because we conclude that it is difficult to determine that the phrase "stop, stop" could not show a lack of consent.  Holt v. State, 17 Wis. 2d 468, 480, 117 N.W.2d 626 (1962).

693 (defendant's confession to fellow prison inmate, gun found in defendant's car identified as the one from which the bullets came, and defendant's confession to friend while showing two bullets corroborated significant facts of confession); State v. DeHart, 242 Wis. 562, 566, 8 N.W.2d 360 (1943) (location and condition of victim's body and expert testimony regarding consistency of bone condition with damage from buckshot consistent with defendant's confession). Having concluded that the neighbor's testimony sufficiently corroborates the statements Thomas made to police, we need not further analyze the importance of the pornographic video found in Thomas's apartment.

¶24 We conclude the State satisfied its burden to present "some evidence" that the sexual assault charged, and to which Thomas confessed, actually occurred. Bannister, 302 Wis. 2d 158, ¶¶24, 25.

### C. The Report at Trial

¶25 The Confrontation Clause of the Sixth Amendment of the United States Constitution prevents the admission of testimonial hearsay when the declarant is absent from trial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 51 (2004). The Sixth Amendment right of confrontation is a "fundamental right, as made applicable to and obligatory on the states by the Fourteenth Amendment." State v. Griep, 2015 WI 40, ¶18, 361 Wis. 2d 657, 863 N.W.2d 567 (citing Pointer v. Texas, 380 U.S. 400, 403 (1965)).

14

¶26 Thomas asks us to consider whether his right to confront his accuser, guaranteed by the Confrontation Clause, was violated at his trial. Specifically, Thomas argues his confrontation right was violated during the State's cross-examination of his expert witness, Dr. Karl Williams. Thomas also asks us to consider the impact of the State's use of testimony, elicited from Dr. Williams himself, for the truth of the matter asserted at closing argument.

### 1. The Cross-Examination

¶27 Thomas called just one witness at trial——Dr. Williams, a medical examiner. On direct examination, Dr. Williams testified that "in allegations of violence resulting in death," he looks for "an exchange of trauma, an exchange of evidence" between the victim and accused. When asked specifically, Dr. Williams replied that he did not see signs of a struggle or of defensive wounds. In his opinion, abrasions on Ms. Oliver-Thomas's face could have resulted from emergency CPR or from engaging in face-down sex on the floor, consistent with Thomas's statements.

¶28 On cross-examination, the State challenged Dr. Williams's characterization that there were no signs of an exchange of trauma through the following cross-examination:

> [Prosecutor]: Now, you also reviewed Wisconsin crime lab reports, correct?
>
> [Dr. Williams]: Correct.
>
> . . . .

15

[Prosecutor]: Okay. But in those crime lab reports, you are aware that there was some analysis done?

[Defense counsel]: Objection.

[Prosecutor]: It's what he relied on in his opinion.[19]

[Defense counsel]: I'm objecting to going into the details of reports that haven't been introduced into evidence, though. It's a back door.

THE COURT: If he examined it, then it's presumably something he discounted or relied upon. The objection is overruled.

[Prosecutor]: And you are aware in those crime lab reports that Oscar Thomas's DNA was found under Joyce Oliver-Thomas's fingernail clippings, which were clipped from her body at the time of the autopsy, correct?

. . . [The State hands the [R]eport to Dr. Williams at his request] . . . .

[Dr. Williams]: Yes, this appears to be an analysis that shows that the DNA found under the [fingernails] was obviously a mixture. You are going to have her DNA, but also evidence of DNA from Oscar Thomas.

[Prosecutor]: And similarly the fingernails from the defendant were also swabbed, and her DNA was found under that as well; is that correct?

[Dr. Williams]: Yes.

[Prosecutor]: Okay.

[Dr. Williams]: They are living in a consensual marriage. A finding of the DNA, they could be scratching each other's back. I mean, there is no

---

[19] Dr. Williams "reviewed" the Report. That he did not "rely" on it also is clear from his testimony that diminishes the importance of the DNA evidence found under the fingernails of Thomas and Joyce, saying there "is no evidence of trauma on him to support the fact that she was struggling sufficiently."

16

> evidence of trauma on him to support the fact that she was struggling sufficiently.

Documents submitted prior to trial indicate Dr. Williams reviewed the Report, among other things, in preparing his testimony. Thomas urges us to conclude that the details elicited on cross-examination of Dr. Williams violated his confrontation right.

### a. Confrontation or Impeachment

¶29 "The Confrontation Clause of the United States Constitution and Wisconsin Constitution guarantee criminal defendants the right to confront witnesses against them." Crawford, 541 U.S. at 42; State v. Manuel, 2005 WI 75, ¶36, 281 Wis. 2d 554, 697 N.W.2d 811. The right to confrontation applies to statements that are testimonial. Crawford, 541 U.S. at 68; State v. Deadwiller, 2012 WI App 89, ¶7, 343 Wis. 2d 703, 820 N.W.2d 149 (citing Davis v. Washington, 547 U.S. 813, 821 (2006)). Testimonial statements are those made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 52. Forensic or scientific reports "prepared in connection with a criminal investigation or prosecution" are testimonial and, therefore, within the ambit of the Confrontation Clause. Bullcoming v. New Mexico, 564 U.S. 647, 658 (2011).

¶30 When forensic or scientific reports are offered for their truth, an accused must be able to confront the witness against him by subjecting the report's author, as the

17

statement's declarant, to the "crucible of cross-examination." Id. at 661 (citing Crawford, 541 U.S. at 62). In the event of witness unavailability, a testimonial statement may be introduced at trial only if an accused has had a "prior opportunity for cross-examination." Crawford, 541 U.S. at 68. It is not enough for a report's author to testify by other means. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009) (ex parte affidavits cannot circumvent the right to confront the declarant by cross-examination); Bullcoming, 564 U.S. at 652 (surrogate testimony does not meet the constitutional requirement and, an "accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused [has] had an opportunity, pretrial, to cross-examine that particular scientist."). In sum, a forensic report cannot be used as substantive evidence against an accused unless an accused may confront the report's author through cross-examination in court or has had a prior opportunity to cross-examine the author. Melendez-Diaz, 577 U.S. at 309.

¶31 Although a criminal defendant must be able to confront a forensic report's author, expert witnesses may review inadmissible reports in preparing their testimony. In Williams, the Supreme Court addressed the constitutionality of "allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." Williams v. Illinois, 567 U.S. 50, 67 (2012) (quoting Bullcoming, 564 U.S. at 673 (Sotomayor, J.,

18

concurring)). There, the Court concluded an expert may qualify the assumptions upon which she bases her conclusions so long as the bases themselves are not offered for their truth. Williams, 567 U.S. at 57-58. The Court reasoned that allowing an expert to make such disclosures aids the factfinder in making credibility and weight determinations about the validity of the expert's opinions. Id. at 77-78.[20] Stated otherwise, eliciting information from an expert for the purpose of undermining the bases of the expert's opinion, serves to impeach an expert; and impeachment evidence is not hearsay because it is not offered to prove the truth of the matter asserted. Id. at 79 (explaining that the Confrontation Clause applies only to out-of-court statements that are "use[d]" to "establis[h] the truth of the matter asserted.").

¶32 Although we acknowledge that Williams does not provide a majority rationale,[21] Wis. Stat. § 907.03 reflects this concept

---

[20] "The purpose for allowing this disclosure is that it may 'assis[t] the jury to evaluate the expert's opinion.' [Citation omitted.] . . . [The approach is] based on the idea that the disclosure of basis evidence can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion . . . . The purpose of disclosing the facts on which the expert relied is to allay these fears——to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record——not to prove the truth of the underlying facts." Williams v. Illinois, 567 U.S. 50, 78 (2012).

[21] Williams resulted in a 4-1-4 split. Four justices joined the lead opinion, and Justice Thomas filed an opinion concurring in the judgment.

19

and permits an expert to review inadmissible reports in forming her conclusions.[22] Despite a report's inadmissibility, or a proponent's failure to obtain admission of the report into evidence, a cross-examiner may use the contents of a report for the "distinctive and limited purpose" of attacking an expert's credibility so a jury may determine the weight to give an expert's testimony. Id.; see Seifert v. Balink, 2017 WI 2, ¶¶124-127, 372 Wis. 2d 525, 888 N.W.2d 816.

¶33 This method of attack may serve to impeach a witness even though cross-examination of an expert witness's bases for her opinion is not a hearsay exception. This is so because substance of reports and data that an expert reviewed are not automatically admitted as evidence for the truth of the matter asserted when they come up in cross-examination for another purpose. See State v. Watson, 227 Wis. 2d 167, ¶78, 595 N.W.2d 403 (1999) ("[Wisconsin Stat. §] 907.03 does not transform inadmissible hearsay into admissible hearsay. It does not permit hearsay evidence to come in through the front door of direct examination."); Staskal v. Symons Corp., 2005 WI App 216, ¶22, 287 Wis. 2d 511, 706 N.W.2d 311 ("[Section] 907.03 is not a hearsay exception and does not make inadmissible hearsay

---

[22] "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert . . . before the hearing . . . . [T]he facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible may not be disclosed to the jury . . . ." Wis. Stat. § 907.03.

admissible."). Instead, parties may strategically determine whether to request cautioning or limiting instructions for the use of a report that is not eligible to be admitted for the truth of the matters asserted therein. Limiting instructions aid a factfinder's understanding of how to evaluate, constrain, or disregard an expert's opinion "if it is not based on evidence of record." Watson, 227 Wis. 2d 167, ¶82.

¶34 Turning to the case at hand, the State's use of the Report to impeach Dr. Williams on cross-examination did not violate Thomas's confrontation right. The State challenged Dr. Williams's conclusion that there was "no exchange of evidence" by referencing the Report that Dr. Williams had reviewed, which showed DNA exchanges under the fingernails of Thomas and Ms. Oliver-Thomas. Stated otherwise, by drawing attention to the "exchange" of DNA between Thomas and Ms. Oliver-Thomas, the State attempted to undermine Dr. Williams's opinion that Ms. Oliver-Thomas's cause of death could have been accidental. The degree to which the State succeeded in limiting the usefulness of Dr. Williams's testimony was then considered by the jury together with all of the evidence in deciding Thomas's guilt. Although we recognize Thomas could have asked for limiting instructions that the jury not consider the Report's contents for their truth because testimony about the contents of the Report was not admitted for substantive purposes, he made no such request. We conclude the State's questioning on cross-examination relevant to the Report

did not violate Thomas's right to confront the Report's author when used to impeach Dr. Williams's opinion.

b. Truth of the Report

¶35 The State summarily asserted at oral argument that it wanted the Report's discussion of DNA evidence found under fingernails employed "for the truth of the matter asserted." The portions of the State's brief relevant to the Report, its contents, and the confrontation right rely extensively on Justice Alito's concurrence in Hemphill v. New York, 595 U.S. ___, 142 S. Ct. 681 (2022). However, at oral argument the State relied on cases not mentioned in its brief, such as, State v. Mattox, 2017 WI 9, 373 Wis. 2d 122, 890 N.W.2d 256, Griep, 361 Wis. 2d 657, and Vinicky v. Midland Mut. Cas. Ins. Co., 35 Wis. 2d 246, 151 N.W.2d 77 (1967).

¶36 As we begin, we review Hemphill and Justice Alito's concurrence and conclude that the State could not use the Report for its truth at Thomas's trial under Crawford or Hemphill.

¶37 In Hemphill, the Supreme Court heard arguments that the State violated defendant Hemphill's confrontation right during the course of its prosecution of him for murdering a young girl who was hit by a stray 9-millimeter bullet. Hemphill, 142 S. Ct. at 686. Hemphill maintained his innocence throughout trial and premised his defense on the theory another man, Morris, was the shooter. Id. at 688. The State had initially charged Morris with the murder but offered Morris a plea deal mid-trial, which required Morris to admit to possession of a .357-magnum revolver, rather than a 9-millimeter

22

handgun. Id. at 686. At Hemphill's trial for the same murder, Hemphill presented "undisputed testimony" that police had recovered a 9-millimeter handgun from Morris's nightstand. Id. Over objection, the trial court permitted the State to enter parts of the transcript from Morris's plea allocution to rebut Hemphill's defense theory, despite Morris's unavailability to testify. Id. The trial court based its decision to allow use of the transcript on a binding New York case,[23] which held that "a criminal defendant could 'open the door' to evidence that would otherwise be inadmissible under the Confrontation Clause if the evidence was 'reasonably necessary to correct a misleading impression.'" Id. at 688. New York's highest court affirmed the trial and appellate courts, reasoning that at trial "[the] defendant created a misleading impression that Morris possessed a 9-millimeter handgun [and so the] introduction of the plea allocution was reasonably necessary to correct that misleading impression." Id. at 688-89.

¶38 The United States Supreme Court rejected New York's corrective ideations, asserting there is "no exception [to the Confrontation Clause] for cases in which the trial judge believes unconfronted testimonial hearsay might be reasonably necessary to correct a misleading impression." Id. at 693. The Supreme Court concluded that New York's rule resulted in a judge impermissibly making a reliability assessment. Id. at 691-92. Under the Confrontation Clause, reliability must be assessed in

---

[23] People v. Reid, 971 N.E.2d 353 (N.Y. 2012).

23

a particular manner: "by testing in the crucible of cross-examination." Id. at 691 (citing Crawford, 541 U.S. at 61). In summing up the opinion, the majority stated, "[T]he Court does not decide today the validity of the common-law rule of completeness as applied to testimonial hearsay. Under that rule, a party 'against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder.'" Id. at 693 (citations omitted).

¶39 Justice Alito concurred in Hemphill. He addressed "conditions under which [he said that] a defendant can be deemed to have validly waived the right to confront adverse witnesses," while using the rule of completeness to get there in some circumstances. Id. at 694 (Alito, J., concurring). Justice Alito said that a defendant may "waive the Sixth Amendment right to confront adverse witnesses through conduct." Id. This was not a case under New York's opening-the-door-to-correct-a-misleading-statement rule because its application was not predicated on "conduct evincing intent to relinquish the right of confrontation," nor was it predicated on "action inconsistent with the assertion of that right." Id. at 694-95. While acknowledging the reasons under which the New York rule fails constitutional muster as related to the confrontation right, Justice Alito stated "[t]here are other circumstances, however, under which a defendant's introduction of evidence may be regarded as an implicit waiver of the right to object to the prosecution's use of evidence that might otherwise be barred by the Confrontation Clause." Id. at 695. The concurrence then

24

suggested the rule of completeness may invoke one of those circumstances. There, "if a party introduces all or part of a declarant's statement, the opposing party is entitled to introduce the remainder of that statement . . . regardless of whether the statement is testimonial or there was a prior opportunity to confront the declarant." Id.

¶40 Justice Alito asserted "the rule of completeness fits comfortably within the concept of implied waiver [of the confrontation right]." Id. By introducing statements of an unavailable declarant, "a defendant has made a knowing and voluntary decision to permit that declarant to appear as an unconfronted witness." Id. Under this theory, a criminal defendant may waive his confrontation right by introducing an incomplete statement of an unavailable declarant; completing an incomplete or misleading statement, the argument goes, demands that the entire statement is "fair game." Id.

¶41 In its brief, the State urges us to accept that the "rationales for the holdings in [Crawford and Hemphill] simply do not apply here."[24] The State characterizes Crawford and Hemphill as rejecting "open-ended, reliability-based exceptions that applied to any kind of evidence."[25] Instead, the State views the Report at issue in Thomas's conviction as belonging to a "narrow category of evidence that a defense expert relied on

---

[24] Resp't. Br. at 28.

[25] Id. (emphasis in original).

and gave factually inaccurate testimony about."[26] While acknowledging the Hemphill concurrence is not binding, the State asserts the concurrence is the guidance courts have in evaluating situations like Thomas's where, in the State's view, Thomas elicited testimony that "flatly contradicted" the Report. Because "he made 'a tactical choice' to put the [R]eport in play," he "waived his confrontation right as to that [R]eport."[27]

¶42 The State is incorrect on several bases. First, it was the State who introduced the Report in its cross-examination of Thomas's expert, not the defendant. Second, to the extent the State views Justice Alito's concurrence as "contemplate[ing] fact patterns like [the one in the instant case]," we fail to see how. Justice Alito plainly states, "The introduction of evidence that is misleading as to the real facts does not, in itself, indicate a [defendant's] decision regarding whether any given declarant should be subjected to cross-examination." Hemphill, 142 S. Ct. at 695 (Alito, J., concurring). In other words, a defendant's introduction of misleading evidence cannot be interpreted to infer a defendant's waiver of his confrontation right. Accordingly, we conclude the State's complaint that Thomas's expert testified in a way it found "misleading as to the real facts," does not amount to an implied waiver of the right of confrontation even under Justice Alito's concurrence.

---

[26] Id. (emphasis in original).

[27] Id. at 30.

¶43 The fault in the State's rationale is apparent when applied to Thomas: Dr. Williams reviewed 219 pages of reports and statements in preparing his testimony. Dr. Williams may very well have concluded the Report's contents regarding DNA evidence did not show signs of "an exchange of evidence." As Dr. Williams testified, the existence of another's DNA under a cohabitating couple's fingernails may have innocent origins and is not necessarily indicative of a struggle. If the State disagreed with his conclusion and sought to challenge it, the appropriate method is through impeachment, as occurred here. Otherwise, we fail to differentiate the State's argument from the reliability determinations that the Supreme Court rejected in Crawford and Hemphill. See Crawford, 541 U.S. at 62-68, rejecting the reliability-based approach of Ohio v. Roberts, 448 U.S. 56 (1980); Hemphill, 142 S. Ct. at 690-92, reaffirming that rejection while overruling People v. Reid, 971 N.E.2d 353 (N.Y. 2012).

¶44 There is little doubt the Report was testimonial when used for its truth. After all, Ms. Oliver-Thomas's fingernails were clipped during her autopsy and sent to a crime lab to determine whose, if anyone's, DNA could be found there. The same could be said for Thomas's fingernails. Under these circumstances an objective witness would certainly believe the resulting statement in a report would be "available for use at a later trial" for its truth. Crawford, 541 U.S. at 52. However, if the State wanted to use the Report for its truth, the State was required to introduce and authenticate the Report and then

27

subject its author to cross-examination by Thomas in accordance with the Sixth Amendment and Melendez-Diaz. Melendez-Diaz, 557 U.S. at 305. The information the State elicited from Dr. Williams on cross-examination for impeachment purposes did not transform the Report into admissible hearsay. We conclude that the State's questioning of Dr. Williams served to impeach his testimony, and that the State's use of the Report for impeachment did not employ the Report's contents for their truth.

### 2. Closing Arguments

¶45 The second instance in which the Report surfaces is during closing arguments, where the State used evidence elicited on Dr. Williams's cross-examination for the truth of the contents of the Report. The prosecution asserted its theory of the case in closing:

> [Prosecutor]: You would have to be high on crack to think that there is any other explanation for Joyce Oliver-Thomas's death than that Oscar Thomas killed her, but it was more than just killing. It was brutal, vicious, violent, choking the life out of her for minutes . . . while he is scratching up her face with his free hand, with his right hand, trying to cover her mouth.
>
> [Defense counsel]: I'm going to object to that. I'm objecting to this demonstrative. There is no evidence of that, Judge.
>
> [Prosecutor]: Closing argument, Your Honor.
>
> THE COURT: Well, no, no, no. Confined to the evidence.
>
> [Prosecutor]: And the evidence supports this theory, Your Honor. We have testimony of the

28

scratches on her face. . . . Her DNA is found under his fingernails. We have testimony from the neighbor downstairs.

THE COURT: All right, as long as you are clear this is your theory, and that --

[Prosecutor]: Absolutely. It is my closing argument, Your Honor. I'm presenting to the jury my theory of how Joyce Oliver-Thomas died, and I think the evidence supports that. This is exactly what I think happened. Oscar Thomas placed his left arm around her throat and squeezed, compressing her neck while using his other hand to muzzle her nose and her mouth to keep her quiet and speed up her death, and that's how she got the scratches on her face.

Over defense counsel's objection, the State assured the judge that "the evidence supports this theory." The State's representation was not correct. There had been no evidence admitted for the truth of the DNA found in the fingernail clippings. The State presented no independent DNA evidence, did not enter the Report into evidence, and it did not otherwise present evidence as to the scratches' origin.

¶46 We conclude the State's reliance on hearsay evidence that was used to impeach Thomas's expert's opinion was improper during closing arguments because the Report then was used for the truth of the statements therein. See State v. Marinez, 2011 WI 12, ¶44, 331 Wis. 2d 568, 797 N.W.2d 399 (limiting the use of evidence that had been admitted because of its high potential for unfair prejudice); State v. Albright, 98 Wis. 2d 663, 676, 298 N.W.2d 196 (Ct. App. 1980) (concluding that reference to confiscated weapons was improper given its potential for unfair prejudice). As stated earlier, the facts or data upon which an expert bases her opinion may be introduced under Wis. Stat.

29

§ 907.03, but only for the limited purpose of assisting the factfinder in determining an expert's credibility. Watson, 227 Wis. 2d 167, ¶82. Evidence brought in for that purpose does not transform into admissible hearsay for subsequent use at trial. Id., ¶78.

¶47 Furthermore, after defense counsel objected, the prosecutor incorrectly assured the judge that, "[T]he evidence supports this theory, Your Honor. We have testimony of the scratches on her face. . . . Her DNA is found under his fingernails." It was therefore erroneous to permit the prosecutor's statement in closing argument because the DNA evidence in the Report was not properly admitted as evidence for its substantive content.

### D. Harmless Error

¶48 Our test for harmless error has varied over the years. Despite variations, we have consistently noted that there has been "little practical difference between the formulations of harmless error which the court has used from time to time." State v. Dyess, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985). Harmless error analyses have been applied to errors claimed to have occurred during closing argument. State v. Johnson, 60 Wis. 2d 334, 344-45, 210 N.W.2d 735 (1973). Over time, we have moved toward implementing a uniform harmless error standard regardless of whether the complained-of error is constitutional, statutory, or other. Harvey, 254 Wis. 2d 442, ¶40. The beneficiary of the error, here the State, has the burden of proving the error was harmless. Id., ¶41.

30

¶49  In addition, "[Wis. Stat.] § 805.18, made applicable to criminal cases by Wis. Stat. § 972.11(1), prohibits reversal for error not affecting a party's substantial rights."  Id., ¶39.  The harmless-error inquiry considers whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  Id., ¶46 (citing Neder, 527 U.S. at 18).

¶50  In reviewing a contention that the error was harmless, we consider evidence that was not affected by the error that occurred during the State's closing argument.  In so doing, we examine whether the State has met its evidentiary burden.

¶51  In regard to the sexual assault, the State offered the following evidence at trial: the downstairs neighbor's testimony asking that Thomas "stop, stop" and the large bump due to something falling on the floor above; and the medical examiner's testimony, discussed below.

¶52  Thomas's friend told the jury the pair had smoked crack together in the apartment basement in the early morning hours on the day Ms. Oliver-Thomas died.  The friend stated at one point he waited about "an hour" for Thomas to return from checking on his wife.  The jury heard that, after Thomas returned to the basement, Thomas "seemed nervous and kind of edgy . . . it was a whole different person from what I [had] seen him like."

¶53  The medical examiner testified regarding the results she found during the forensic examination of Ms. Oliver-Thomas. The medical examiner provided testimony as to her autopsy

31

report, which was received into evidence. The jury heard the medical examiner's testimony that "the decedent had injuries to her face and her neck consistent with strangulation," such as hemorrhage and bruising along the front of the victim's neck and throughout the neck muscles. The examiner further testified to bruises and bites on the victim's tongue, which she stated may have been caused "by a force against the neck pushing the back of the neck into the spine." She also testified that she found injuries on the victim's lips in addition to scratches on her face. She continued by describing petechiae, small burst vessels that she observed in the victim's eyes and which are commonly seen in strangulation cases. The examiner further testified that the victim had approximately 70ccs of bloody fluid in her stomach, which the victim swallowed. The State also entered nine photographs from Ms. Oliver-Thomas's autopsy into evidence.

¶54 None of this evidence was affected by the State's substantive use of the hearsay Report in closing argument. While Thomas presented a medical expert in his defense, we make no determination as to the jurors' assessment of credibility and weight.

¶55 The harmless error query does not reduce to a mere quantum of evidence, but instead, whether absent the hearsay/Report it is clear beyond a reasonable doubt that a rational jury would have found Thomas guilty. Here, we conclude that the State offered sufficient evidence for a rational jury to determine Thomas sexually assaulted and intentionally took

32

the life of his wife. All of the observations of physical injury to Ms. Oliver-Thomas are consistent with the jury's conclusion that Thomas's interactions with her were not consensual and were intentional. Accordingly, we conclude that the State has met its burden to show that the error was harmless.

### III. CONCLUSION

¶56 We affirm the court of appeals and conclude that the State met its evidentiary burden to sufficiently corroborate Oscar C. Thomas's confession of sexual assault. We also conclude that the State's use of the Report that a defense expert reviewed, but which was not admitted into evidence, did not violate Thomas's confrontation right under the United States' Constitution or the Wisconsin Constitution when used for impeachment purposes.[28] However, we reject the State's argument that it properly used the Report's contents, during closing argument. Furthermore, following Hemphill, a criminal defendant does not "open the door" to the introduction of testimonial out-of-court statements for the purpose of "correcting" a "misleading impression." Although we conclude that the State did not use the content of the Report for its truth on cross-examination, the State improperly used the Report's content for its truth during closing arguments, which the circuit court

---

[28] We note that Justice Dallet's concurrence concludes the opposite, and is the decision of the court in regard to use of the Report during cross-examination of Thomas's expert witness. See ¶2, supra.

33

erroneously permitted. However, we conclude the error was harmless because it is "clear beyond a reasonable doubt that a rational jury would have found [Thomas] guilty absent the error." Harvey, 254 Wis. 2d 442, ¶46 (citing Neder, 527 U.S. at 18).

*By the Court.*—The decision of the court of appeals is affirmed.

¶57 REBECCA FRANK DALLET, J. *(concurring).* I join the portion of the majority/lead opinion holding that Thomas's confession was sufficiently corroborated to be admissible. See majority/lead op., ¶¶12-24. As noted in the majority/lead opinion,[1] because this concurrence is joined by Justices Ann Walsh Bradley, Rebecca Grassl Bradley, and Jill J. Karofsky, it represents the decision of the court with respect to the second issue raised in this case: Whether the State violated Thomas's rights under the Sixth Amendment's Confrontation Clause when it elicited testimony about DNA evidence contained in a Crime Lab report not in evidence without affording Thomas the opportunity to cross-examine the report's author.

¶58 I conclude that the State violated Thomas's Sixth Amendment rights. The State sought the DNA evidence described in the Crime Lab report for its truth at trial. That much is clear from the prosecutor's closing argument to the jury. And the State confirmed that the DNA evidence was offered for its truth throughout briefing and during oral argument in this court.[2] For that reason, the DNA evidence in the Crime Lab report was testimonial hearsay; it was an out of court

---

[1] See majority/lead op., ¶2.

[2] The majority/lead opinion is right that the State's position has changed over time. See majority/lead op., ¶7. In the post-conviction proceedings, at the court of appeals, and in its response to Thomas's petition for review, the State argued that the DNA evidence was used for impeachment at trial. But that does not change what happened at trial or in briefing and oral argument before us, where the State took the consistent position that the DNA evidence was elicited and used for its truth.

1

statement, prepared "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and offered by someone other than the declarant for the truth of the matters asserted. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009) (quotation omitted). Because the author of that report was not available for cross-examination, admitting testimony about it therefore violated the Confrontation Clause. Nevertheless, because that Confrontation Clause violation was harmless, I conclude that Thomas's convictions should stand.

I

¶59 Thomas's forensic expert, the sole defense witness at trial, testified on direct examination that he did not see any defensive wounds or "signs of a struggle" on the victim. This was important because Thomas argued that he killed the victim accidentally. During cross-examination, the State asked Thomas's expert if he reviewed reports from the Wisconsin Crime Lab in reaching his conclusions. This was the first time the Crime Lab report and the DNA evidence contained in it came up at trial, and defense counsel objected to any questioning about the contents of the report. The circuit court overruled the objection, however, and allowed the State to ask Thomas's expert about the report because he reviewed it before reaching his opinion. The prosecutor then asked the expert about the report's finding that Thomas's DNA was under the victim's fingernails at the time of the autopsy. After looking at the report, Thomas's expert said "[y]es, this appears to be an

2

analysis that shows that the DNA found under the fingerprints [sic] was obviously a mixture. You are going to have [the victim's] DNA, but also evidence of DNA from Oscar Thomas." He also confirmed that the victim's DNA was found under Thomas's fingernails. Thomas's expert dismissed those conclusions, however, explaining that Thomas and the victim were married, and "[a] finding of the DNA, they could be scratching each other's back. I mean, there is no evidence of trauma on him to support the fact that she was struggling." The report was never admitted into evidence.

¶60 The State's actions would have been permissible if, as the majority/lead opinion hypothesizes, it was done only to impeach Thomas's expert during cross-examination.[3] See majority/lead op., ¶¶29-34. But the record, and the State's briefing and presentation at oral argument, all establish that the evidence was offered for the truth of matters contained in the report——that the victim's DNA was under Thomas's fingernails and Thomas's DNA was under her fingernails. That was why, when the circuit court told the prosecutor to confine his closing arguments to the evidence, he responded——in front of the jury—— that "[w]e have testimony of the scratches on [the victim's] face. We have testimony that it could have been caused by DNA.

---

[3] After all, experts may rely on inadmissible evidence, including hearsay, in forming their opinions. See Wis. Stat. § 907.03. And if an expert does so, that inadmissible evidence can be used to impeach the expert's credibility on cross-examination, but not for the truth of the matters asserted. See Wis. Stat. § 907.05; see also State v. Heine, 2014 WI App 32, ¶10, 354 Wis. 2d 1, 844 N.W.2d 409. Nevertheless, as explained below, that is not what happened at Thomas's trial.

Her DNA is found under his fingernails." The only "testimony" about DNA was Thomas's expert's answers about the Crime Lab report's findings during cross-examination. And if there was any remaining question about the purpose of eliciting that testimony, it was answered in briefing and at oral argument in this court,[4] where the State consistently asserted that Thomas impliedly waived his right to confront the author of the Crime Lab report when his expert's testimony contradicted the report's contents.

¶61 Nevertheless, the majority/lead opinion insists that the State used the evidence during cross-examination not for its truth, but only to impeach Thomas's expert's credibility. See majority/lead op., ¶34. That is correct, in the majority/lead opinion's view, since the State's briefing "did not argue that the Report could be used for the truth of its contents." Id., ¶7. But the majority/lead opinion misunderstands the State's position. Its argument that Thomas impliedly waived his confrontation right only matters if the report was used for its truth. After all, the Confrontation Clause only prohibits the introduction of testimonial hearsay, and hearsay is, by definition, an out of court statement that is "offered in evidence to prove the truth of the matter asserted." See Wis. Stat. § 908.01(3) (emphasis added); see also Crawford v.

---

[4] For example, when speaking about why the evidence was admitted, the State's counsel stated that "we want it for the truth of the matter asserted," "[t]he State is not asking [for] it as impeachment," and "I don't want to go down the path of just calling it impeachment . . . ."

4

*Washington*, 541 U.S. 36, 53 (2004). Thus, the State's consistent position before us is that it did not violate the Confrontation Clause when it sought to establish the truth of the Crime Lab report's findings through Thomas's expert's testimony on cross-examination.

¶62 The problem with that position is that the Confrontation Clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting *Crawford*, 541 U.S. at 54). Crime lab reports are testimonial statements because they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 310 (quotation omitted); *see also* *Bullcoming v. New Mexico*, 564 U.S. 647, 658-59 (2011). And for that reason, the conclusions reached by such reports may be admitted for their truth at trial only if the person who prepared the report is subject to cross-examination. See *Bullcoming*, 564 U.S. at 663.

¶63 That wasn't the case at Thomas's trial. Instead, through its questioning of Thomas's expert, the State was able to elicit DNA evidence from the Crime Lab report without affording Thomas the opportunity to confront the analyst who prepared that report——a straightforward Confrontation Clause violation. See *id.* at 662 ("[T]he [Confrontation] Clause does not tolerate dispensing with confrontation simply because the

5

court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.").

¶64 The State tries to sidestep that violation by arguing that Thomas impliedly waived his right to confront the analyst who prepared the Crime Lab report when his expert witness "relied on" the DNA evidence in that report and then "gave factually inaccurate testimony about" it. This argument is based on the direct testimony of Thomas's expert that he did not see any defensive wounds or "signs of a struggle" on the victim. The State claims that was inaccurate because the DNA evidence showed that Thomas's DNA was under the victim's fingernails (and her DNA under his).[5] And for that reason, the State did not violate the Sixth Amendment by establishing the facts contained in the report through cross-examining Thomas's expert.

¶65 This argument, however, mirrors an evidentiary rule the United States Supreme Court recently held was unconstitutional in Hemphill v. New York, 142 S. Ct. 681 (2022). That rule allowed evidence that would otherwise violate the Confrontation Clause to be admitted when the defendant "opened the door;" that is, when the defendant created "a misleading impression that requires correction with additional materials from the other side." Id. at 691 (quotation omitted). The

---

[5] This argument is questionable even on its own terms since, as Thomas's expert explained, the DNA evidence does not necessarily indicate that a struggle occurred. Indeed, the expert stated that because Thomas and the victim lived together, he would expect to find their DNA under each others' fingernails.

6

Court rejected that rule because the Sixth Amendment's text "'does not suggest any open-ended exceptions from the confrontation requirement to be developed by courts.'" Id. at 690 (quoting Crawford, 541 U.S. at 54). As the Court explained, "[f]or Confrontation Clause purposes, it was not for the judge to determine whether the [defendant's] theory . . . was unreliable, incredible, or otherwise misleading in light of the State's proffered . . . evidence," or whether that proffered evidence was "reasonably necessary to correct that misleading impression." Id. at 692.

¶66 The State attempts to distinguish Hemphill by arguing that Thomas impliedly waived his confrontation right. As the State notes, Hemphill left open the possibility that one type of implied waiver, the common-law rule of completeness, might allow testimonial hearsay to be admitted under certain circumstances. See id. at 693. And Justice Alito's concurrence in Hemphill suggested that defendants can impliedly waive their confrontation right in other ways, by engaging in "conduct evincing intent to relinquish the right of confrontation" or by taking an "action inconsistent with the assertion of that right." Id. at 694-95 (Alito, J., concurring).

¶67 Drawing on that framework, the State argues for a "narrow solution" that applies to the "narrow category of evidence that a defense expert relied on and gave factually inaccurate testimony about." The problem with this argument is that it rests on the same flawed approach the U.S. Supreme Court rejected in Hemphill. See Hemphill, 142 S. Ct. at 691. As

7

Justice Alito acknowledged in his concurrence, a defendant's introduction of evidence that is allegedly misleading as to the real facts is not, by itself, the kind of act that signals an intent to relinquish the Sixth Amendment right to confrontation. See id. at 695 (Alito, J., concurring). Yet that is what the State asks us to conclude: that the DNA evidence contained in the Crime Lab report "was reasonably necessary to correct [the] misleading impression" created by Thomas's expert's testimony that he did not see any defensive wounds or "signs of a struggle" on the victim. See Hemphill, 142 S. Ct. at 692. But adopting the State's position would defy Hemphill——something we cannot do. Accordingly, Thomas did not impliedly waive his Confrontation Clause right, and admitting testimony about the contents of the Crime Lab report without affording him the opportunity to confront its author violated the Sixth Amendment.

II

¶68 Nevertheless, I conclude that the Confrontation Clause violation that occurred here was harmless. An error is harmless if the State proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). Thus, we look "not [to] what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (citing Chapman, 386 U.S. at 24); see also id. ("The inquiry, in other words, is not whether, in a trial that occurred without the error, a

8

guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." (emphasis in original)).

¶69 Here, it is clear beyond a reasonable doubt that the admission of the DNA evidence did not contribute to the guilty verdict. To be sure, the DNA evidence was used as support for the State's theory that Thomas intended to kill the victim and, conversely, to rebut Thomas's theory that the death was accidental. And admittedly, the DNA evidence was somewhat useful in that regard as it bolstered the State's narrative that Thomas scratched the victim's face with his free hand while choking her to death. But the evidence wasn't necessary to support that theory since the State's case was already strong without it. The jury heard testimony from the medical examiner about injuries to the victim's face, neck, tongue, and lips, all of which were consistent with Thomas violently and intentionally strangling the victim. Additionally, the jury also heard from Thomas's neighbor, who awoke to a loud argument in the middle of the night and a woman screaming "[s]top, stop, I love you, I love you." She then heard a loud noise, furniture moving, and silence.

¶70 Finally, even though the jury heard evidence that the victim's DNA was found under Thomas's fingernails, the rest of Thomas's expert's testimony undercut the importance of that fact. When the prosecutor asked Thomas's expert about the DNA evidence, he said the presence of the DNA was unsurprising given that Thomas and the victim were a couple that lived together.

9

Thus, even though it was erroneous to admit the DNA evidence in violation of Thomas's Confrontation Clause rights, it is clear beyond a reasonable doubt that the error did not contribute to the jury's guilty verdict. See id.

¶71 I am authorized to state that Justices ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and JILL J. KAROFSKY join this opinion.

¶72 BRIAN HAGEDORN, J. *(concurring)*. A majority of this court holds that the testimony of Oscar Thomas's neighbor corroborates a significant fact underlying his conviction for first-degree sexual assault. I agree and join ¶¶12-24 of Justice Roggensack's majority/lead opinion. A majority of the court also rejects Thomas's plea for a new trial on the grounds that his Sixth Amendment Confrontation Clause rights were violated. This alleged error arose when, during cross-examination, the State elicited testimony from a defense expert about certain DNA evidence in a crime lab report that was not admitted into evidence. During its closing argument, the State urged conviction in partial reliance on that DNA evidence. I agree with my colleagues that any alleged Confrontation Clause violation was harmless. But I do not join their analysis of the Confrontation Clause issues for two reasons.

¶73 First, it is unclear how to analyze and categorize the State's use of the report. In response to Thomas's postconviction motion and his appeal, the State argued the DNA evidence was used for impeachment purposes. However, in briefing and at argument before us, the State asserts, and Thomas agrees, that the DNA evidence was admitted for its truth during cross-examination. Justice Roggensack's opinion concludes that the DNA evidence was properly used to impeach the defense expert——relying on the parties' prior arguments. By contrast, Justice Dallet's opinion relies on the State's current representation, despite the fact that is not how this issue was litigated or represented below. This is unusual, to say the

1

least, and forms a questionable foundation upon which to opine on these matters.

¶74 Second, the confrontation issues in this case are novel and factually complicated. They center on how to treat a report not admitted into evidence that is nonetheless reviewed by a testifying defense expert. May the contents of such a report be explored on cross-examination by the State? To what end? The United States Supreme Court, whose decisions we are principally applying in this area of law, has not addressed this question. With little guidance from the Supreme Court in this still emerging area of law, and because this case is sufficiently resolved on harmless error, I would not wade into these uncharted waters at this time.

¶75 Rather than forge our own path on the State's use of the evidence, or analyze a novel area of federal constitutional law where the United States Supreme Court has left much unaddressed, I would simply conclude the Confrontation Clause errors Thomas alleges, if they are errors at all, were harmless. Thomas is not entitled to a new trial and his convictions should be affirmed. I respectfully concur.