# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP2005-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, <br>          Plaintiff-Respondent, <br>     v. <br> Garland Dean Barnes, <br>          Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 397 Wis. 2d 241,959 N.W.2d 75
(2021 - unpublished)

| | |
|---|---|
| OPINION FILED: | June 6, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 3, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Douglas |
|   JUDGE: | Kelly J. Thimm |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court. ZIEGLER, C.J., filed a concurring opinion, in which ROGGENSACK, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Cole Daniel Ruby* and *Martinez & Ruby, LLP,* Baraboo. There was an oral argument by *Cole Daniel Ruby*.

For the plaintiff-respondent, there was a brief filed by *John W. Kellis*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *John W. Kellis*, assistant attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP2005-CR
(L.C. No. 2013CF118)

STATE OF WISCONSIN      :      IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Garland Dean Barnes,**

    **Defendant-Appellant-Petitioner.**

**FILED**

**JUN 6, 2023**

Sheila T. Reiff
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion for a unanimous Court. ZIEGLER, C.J., filed a concurring opinion, in which ROGGENSACK, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA GRASSL BRADLEY, J. This case raises two issues. The first concerns the right of a criminal defendant to be confronted with the witnesses against him under the Sixth Amendment to the United States Constitution. The second concerns harmless error.

¶2 Garland Dean Barnes was charged with delivering more than 50 grams of methamphetamine. As a discovery sanction, the circuit court prohibited Agent Duane Clauer from testifying at

the trial.[1] During the trial, the State asked another officer about Clauer's observations during a "controlled buy," i.e., a police setup to catch someone selling drugs. Barnes objected, arguing the testimony would be hearsay. The State responded that it was not seeking to introduce hearsay because it was not planning to use the testimony for the truth of the matter asserted. Instead, the State claimed the testimony would show why this other officer thought Barnes had sold meth (i.e., the other officer's state of mind). The court overruled Barnes's objection. The jury found him guilty. A judgment of conviction was entered, and Barnes sought postconviction relief, arguing his confrontation right had been violated. The circuit court denied relief. Barnes appealed, and the court of appeals affirmed the circuit court's denial, reasoning the testimony was not offered for the truth of the matter asserted. State v. Barnes, No. 2018AP2005-CR, unpublished slip op., ¶¶33, 35 (Wis. Ct. App. Mar. 16, 2021) (per curiam). The court of appeals also indicated that if an error occurred, it was harmless. Id., ¶35 n.7.

¶3 We assume without deciding that Barnes's confrontation right was violated; however, we hold the error was harmless. Among other considerations, the evidence of Barnes's guilt was overwhelming. Accordingly, "the guilty verdict actually rendered in *this* trial was surely unattributable to the error."

---

[1] The Honorable Kelly J. Thimm, Douglas County Circuit Court, presided.

2

<u>Sullivan v. Louisiana</u>, 508 U.S. 275, 279 (1993). We therefore affirm the decision of the court of appeals.

## I. BACKGROUND

¶4 Charles Marciniak, a police informant, told police that a man he knew as "Dean"——later identified as Barnes—— offered to sell him meth.[2] Marciniak also explained Barnes was able to make the sale that same day. An email from an assistant district attorney explained that Marciniak faced serious felony charges and received a favorable sentencing recommendation for participating in multiple controlled buys. Marciniak testified he did not receive any promise from the State before he decided to participate in the buys.

¶5 In response, Sergeant Franz Winterscheidt assembled a team to catch Barnes selling meth to Marciniak. In addition to Winterscheidt, the team included two officers who testified at the trial, Investigator Jason Tanski and Sergeant James Madden. The team also consisted of other officers who did not testify, including Agent Clauer.

¶6 Police first recorded four phone conversations between Marciniak and Barnes. The recordings took place in the presence of police and were played for the jury.

¶7 At about 5:20 p.m., Marciniak called Barnes. Barnes said he was a mere "40 minutes away." The controlled buy occurred around 6:15 p.m., rendering events between this call and the buy temporally proximate.

---

[2] Marciniak had prior criminal convictions.

3

¶8 Barnes called Marciniak about 15 minutes later, and the two discussed where to meet. Barnes suggested "my little spot," but Marciniak did not know what that meant. When Marciniak questioned Barnes, Barnes mentioned a "motel," but Marciniak remained confused. Marciniak testified that the two had generally met in the parking lot of a bar. The two did not explicitly agree to meet at a particular location during the phone calls, but Marciniak advised police the controlled buy would take place in the bar parking lot. Sergeant Winterscheidt testified, based on his training and experience, that the call involved "coded talk for the arrangement of a drug transaction."

¶9 The recording of the third call picked up only Marciniak's voice. Sergeant Winterscheidt, who was with Marciniak during the call, explained that he could hear two voices, but only Marciniak's was recorded because another officer plugged an earbud into the wrong audio jack. In the recording, Marciniak said: "Hello. Two? Alright. I'll take 'em. You're gonna have to -- you're gonna have to run up again then maybe. You might have to see me sooner than next weekend. What's that? Right on. Well then, 4? Alright. Do that. Alright. Bye."

¶10 Marciniak's dialogue in the recording of the third call is consistent with Sergeant Winterscheidt's testimony as well as Marciniak's. Winterscheidt identified the other voice as Barnes's. Winterscheidt testified the conversation was about "the quantity of meth[] that was expected to be delivered," although Winterscheidt admitted on cross-examination that he had

4

trouble hearing Barnes's "specific words[.]" After the call ended, but while the recording device was still on, Winterscheidt said, "I need that other 1800." Winterscheidt explained Marciniak initially "believed" Barnes would sell 3 ounces of meth for $1,800 an ounce, so Winterscheidt knew more money would be needed after the third call.

¶11 Marciniak explained that during the third call Barnes offered to sell two ounces of meth. Marciniak responded that he would like more to avoid having to meet again soon. Barnes then proposed four ounces. Marciniak agreed and planned to purchase four ounces for $1,800 an ounce, for a total price of $7,200. Marciniak testified he had initially informed Sergeant Winterscheidt that he was not sure how much he could buy but expected about three ounces, so Winterscheidt knew he needed more money after the call. Importantly, the exact amount of drugs to be sold was not agreed upon until shortly before the controlled buy. Barnes placed a fourth call to Marciniak to tell him, "I'm probably gonna be there 7, 8 minutes."

¶12 Sergeant Winterscheidt testified that police prepared Marciniak for the controlled buy. Police thoroughly searched Marciniak's person——except for his private areas——and his truck, looking for currency and contraband.[3] Marciniak testified police patted him down, checked inside his socks and shoes, and

---

[3] Sergeant Winterscheidt personally searched Marciniak. Who searched Marciniak's vehicle is unclear from the record, but multiple officers and Marciniak testified it was in fact searched.

searched his truck. Finding neither currency nor contraband, police fitted Marciniak with a recording device and sent him to the bar parking lot with $7,200 in marked bills inside a white plastic bag. Officers followed "within viewing distance."

¶13 According to Marciniak, he entered the parking lot in his truck and parked next to Barnes's truck, with the driver's-side doors facing each other. Marciniak testified he threw the bag of money into Barnes's truck, and then Barnes threw back a black box. Marciniak noticed Barnes's girlfriend, Bobbi Reed, in Barnes's truck. Marciniak testified he was "one-hundred percent" certain that Barnes, not Reed, tossed the box.

¶14 Police watched from a distance. Investigator Tanski testified he could see Marciniak's parked truck and watched as another truck approached. The officer noted the vehicles parked with both driver's-side doors facing one another and the other truck left "relatively fast," although he could not see the actual transaction from his angle. Sergeant Madden explained the buy occurred "very quick." The testimony of the various officers indicates some officers arrived shortly before the controlled buy and others shortly after.

¶15 The controlled buy was not videotaped, and the audio picked up by the recording device Marciniak wore was not introduced. Sergeant Winterscheidt noted that "we've had investigators spotted conducting video surveillance on controlled buys. It makes it difficult." He explained video cameras are used "selectively" in controlled buys. In this case, officers did not know where the buy was going to take

6

place until part way through "the process of forming the team[.]" Under the circumstances, Winterscheidt testified police did not have time to set up covert video surveillance. Investigator Tanski confirmed, "the location was set during those phone calls. So it was a very short time from one of the last phone calls to where the location was determined." Sergeant Madden also explained that because the buy happened on a Sunday, "[i]t was hard to find investigators to come in," which seems to have contributed to the lack of video surveillance.

¶16 Sergeant Winterscheidt testified that after the controlled buy, he received a radio call from an unidentified officer informing him that "it went down, deal is done." Thereafter, Winterscheidt gave the order to arrest Barnes. Barnes noticed police were approaching and fled in his truck. After a short car chase, police cornered Barnes's vehicle. The $7,200 was found sitting near the center console, still in the white plastic bag. Police also found thousands of dollars in unmarked cash on Barnes's person and in his vehicle. Police searched Reed and found meth and heroin.

¶17 Sergeant Winterscheidt testified that about five minutes after arresting Barnes, police met with Marciniak at a predetermined location.[4] For a brief period, police did not have a visual on Marciniak; however, Winterscheidt testified that "as

---

[4] Investigator Tanski estimated between 5 and 10 minutes passed.

7

far as [Marciniak] knew, [police] were directly behind him[.]" Officers probably would have maintained surveillance but for the need to divert attention from Marciniak to Barnes as he attempted to flee. Marciniak testified he did not leave his truck or meet with anyone between the time of the controlled buy and his later meeting with police.

¶18 Sergeant Winterscheidt then recovered the black box from Marciniak's truck. Winterscheidt testified the box contained four ounces of meth. When Sergeant Winterscheidt was asked why he was so confident that Marciniak did not get the black box during the five-minute period, Winterscheidt explained:

> There's no way to know [with] 100 percent assurance that he didn't receive meth[] from an alien that descended from the sky. It is —- given the circumstances and the time frame of which we did respond to . . . Marciniak's location, I don't believe that he could have received meth[] from any other source other than . . . Barnes.

Similarly, Investigator Tanski testified the box was not "crumpled or mangled" and did not have any creases that would indicate it had been "bent or shoved into any type of nook or cranny[.]"

¶19 The State charged Barnes with delivering more than 50 grams of meth. Shortly before trial, Barnes moved to exclude Agent Clauer's testimony because the State had only recently listed him as a witness and provided Clauer's reports. The reports indicate Clauer observed the transaction. The circuit court granted the motion.

8

¶20 The trial lasted two days. Barnes attacked the thoroughness of the investigation while cross-examining Sergeant Winterscheidt. Specifically, he suggested Marciniak may have been the seller and Barnes the buyer, not the other way around as police thought. Barnes's questioning indicated concern that police did not videotape the controlled buy. During closing argument, Barnes maintained he was trying to purchase meth for his drug-addicted girlfriend, not sell it. He asserted he was tricked by Marciniak, who framed him to curry favor with police. Barnes's girlfriend, Reed, did not testify.[5]

¶21 On redirect examination, the State asked Sergeant Winterscheidt, "[a]re you aware of any specific officers who saw the transaction that . . . Marciniak described to you where he tossed in the buy money and [Barnes] tossed in the black box?" Barnes did not object. Winterscheidt replied, "[y]es."

¶22 The State then asked which officer observed the controlled buy. Barnes objected, arguing the testimony would be hearsay. The circuit court overruled the objection, agreeing with the State that the testimony would establish Sergeant Winterscheidt's "state of mind" (i.e., why he thought Barnes, and not Marciniak, was the seller). The State repeated the question, worded slightly differently: "Sergeant, which investigator saw . . . Marciniak toss in a white plastic bag and . . . Barnes toss in a black box? . . . What agent saw

---

[5] The State wanted to call Reed to the stand, but the circuit court prohibited Reed from testifying as a discovery sanction.

that?" Winterscheidt responded, "[i]t was . . . [Agent] Clauer."[6]

¶23 Barnes recalled Sergeant Winterscheidt, and in an odd turn, solicited testimony about Agent Clauer's observations:

Q. [W]as there a continuous officer present watching this entire transaction?

A. I don't know what you mean by continuous officer present watching . . . Marciniak or watching the controlled buy.

Q. I thought you testified yesterday that there were police eyes on the transaction at all times. Do you remember saying that or words to that effect?

A. That's what I was under the impression of.

Q. Okay. I didn't ask you what you were under the impression of. I asked you whether or not there were eyes always on the suspect. . . . You didn't have video cameras but you testified that there . . . [were] a bunch of cops running around and other officers watching this alleged transaction. Do you remember that?

A. I remember testifying that . . . [Agent] Clauer -- that I learned . . . Clauer had observed the transaction.

Q. So is it your testimony that there was or was not constant visual surveillance of the alleged buy?

A. I don't know that there was constant visual surveillance at all times of the events leading up to the buy and the hand-to-hand transaction. I was only given information that . . . Clauer actually observed the hand transaction.

_____

[6] The circuit court indicated it would be willing to give a jury instruction to inform the jury it should not use Sergeant Winterscheidt's testimony that Agent Clauer observed the controlled buy for the truth of the matter asserted. Barnes did not request such an instruction, so one was not given.

¶24 After Barnes was convicted, he moved for a new trial. Among other points, he argued the circuit court erred in admitting Sergeant Winterscheidt's testimony that Agent Clauer observed the controlled buy. The court denied the motion, reiterating its conclusion that the testimony "went to . . . Winterscheidt's state of mind[.]" The court also reasoned if an error occurred, the error was not "of the significance that would need the [c]ourt to order a new trial. I think [the alleged error was] minor in the context of this long -- it wasn't a long trial, but it was two days." It emphasized that "[t]here were a number of witnesses. There was a lot of testimony for even being two days."

¶25 Barnes later filed a motion for postconviction relief, arguing, among other things, that his confrontation right was violated.[7] He asserted: "The reason for [Sergeant] Winterscheidt's actions (moving in to arrest Barnes) was amply explained by other evidence[.]" Barnes maintained "[t]here was absolutely no need for [Winterscheidt] to take it a step further and explain that one officer claimed to have observed the hand-to-hand [transfer] and that Barnes produced the meth." The circuit court denied the motion.

¶26 Barnes appealed, and the court of appeals affirmed the circuit court's denial. Barnes, No. 2018AP2005-CR, ¶33

---

[7] At trial, Barnes objected on hearsay grounds but did not make a confrontation objection. The State has not argued that Barnes forfeited his confrontation objection, so we do not address the issue.

11

(citation omitted). The court of appeals noted that "[t]he testimony had the convenient effect for the State of rebutting some of Barnes's attempts to impugn the quality of the investigation." Id. Applying a discretionary standard of review, the court of appeals determined "the circuit court could [still] reasonably conclude that the testimony was not being offered to show that [Agent] Clauer had, in fact, observed the transaction but, rather, to show why [Sergeant Winterscheidt] had taken subsequent investigative steps." Id. (citation omitted). Because the court of appeals decided the testimony was not hearsay, it concluded Barnes's confrontation right had not been violated. Id., ¶35. The court of appeals also indicated that if an error occurred, it was harmless. Id., ¶35 n.7. Barnes filed a petition for review, which this court granted in part, confining the parties to Barnes's confrontation right claim and hearsay argument.

## II. STANDARD OF REVIEW

¶27 Barnes argues his confrontation right was violated. As framed by the parties, the crux of the issue is whether Sergeant Winterscheidt's testimony regarding Agent Clauer's observations constituted "hearsay," i.e., an "out-of-court statement[] offered in evidence to prove the truth of the matter asserted." See State v. Hanson, 2019 WI 63, ¶19, 387 Wis. 2d 233, 928 N.W.2d 607 (quoting United States v. Tolliver, 454 F.3d 660, 666 (7th Cir. 2006)). We assume without deciding that Barnes's confrontation right was violated. Appellate courts often decide cases on "the narrowest possible grounds"——

12

in this case, harmless error. See Barland v. Eau Claire County, 216 Wis. 2d 560, 566 n.2, 575 N.W.2d 691 (1998) (citing State v. Blalock, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989)).

¶28 The State argues that even if Barnes's confrontation right were violated, the error was harmless. Under well-established precedent, such a violation "does not result in automatic reversal" and "is subject to harmless error analysis." See State v. Deadwiller, 2013 WI 75, ¶41, 350 Wis. 2d 138, 834 N.W.2d 362 (citations omitted). Whether an error was harmless is a question of law, subject to our independent review. State v. Magett, 2014 WI 67, ¶29, 355 Wis. 2d 617, 850 N.W.2d 42 (citing Weborg v. Jenny, 2012 WI 67, ¶43, 341 Wis. 2d 668, 816 N.W.2d 191).

### III. ANALYSIS

¶29 An error is harmless if "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." Sullivan, 508 U.S. at 279. The "overall strength of the State's case" is often an important consideration. Deadwiller, 350 Wis. 2d 138, ¶41 (quoting State v. Martin, 2012 WI 96, ¶46, 343 Wis. 2d 278, 816 N.W.2d 270). Other considerations include "the frequency of the error" and the "nature of the defense[.]" Id. (quoting Martin, 343 Wis. 2d 278, ¶46).

¶30 The evidence against Barnes was overwhelming. See id. The State argues, "[t]he problem with Barnes's argument is that it assumes the jury would have questioned who delivered drugs to whom had Sergeant Winterscheidt not testified that Agent Clauer witnessed the transaction. Given the strength of the State's

13

case, there is simply no chance that would have happened." We agree.

¶31 The recorded phone conversations before the controlled buy significantly strengthen the State's case. The third call is particularly incriminating. While Barnes's voice cannot be heard in it, Sergeant Winterscheidt confirmed Barnes was in fact speaking. Marciniak's recorded dialogue leaves little doubt that he was acting as a prospective buyer, not a seller. Marciniak was asked a question, to which he responded, "[t]wo? Alright. I'll take 'em." As the State notes, "[i]f Marciniak were dealing to Barnes as suggested, in what context would he tell Barnes that he would take two of something? Two dollars? Two of some item in a trade?" Applying common sense, Marciniak responded to an offer to sell something. As the conversation continued, Marciniak stated, "[y]ou're gonna have to run up again then maybe. You might have to see me sooner than next weekend. What's that? Right on. Well then, 4?" These comments similarly make little sense if they were coming from a seller. If Marciniak were selling to Barnes, Marciniak probably would not tell Barnes they would need to meet again; rather, Barnes would dictate when he needed to buy more drugs.

¶32 Sergeant Winterscheidt emphasized the phone calls were like many others he had heard before. Despite Barnes's argument, nothing in the calls caused Winterscheidt any concern. In particular, Winterscheidt explained the second call involved "coded talk for the arrangement of a drug transaction."

14

¶33 After the phone calls, police searched Marciniak and his truck before the controlled buy to ensure he did not have currency or contraband. Winterscheidt described the searches as thorough, and Marciniak's testimony was consistent with that description. After the searches, police gave Marciniak $7,200 in marked bills. Police and Marciniak then went to the buy location. Barnes was indisputably present. Shortly after the sale, Barnes fled from police and was ultimately apprehended with the marked bills in addition to thousands of dollars of unmarked cash——an unusual amount for an ordinary person to carry but not uncommon for a drug dealer. Marciniak had four ounces of meth in a black box. The box did not appear to have been hidden.

¶34 Marciniak was with police before the controlled buy and police met with Marciniak shortly after arresting Barnes, minimizing any chance that Marciniak could have obtained the black box at some point after the searches. Sergeant Winterscheidt testified Marciniak was out of sight for a mere five minutes. This fact is especially important considering all of the evidence indicates the quantity of meth to be sold was not known until shortly before the buy. If Marciniak set Barnes up, Marciniak either guessed correctly that the deal would be for four ounces or found and placed this exact amount of meth into the box within an especially short timeframe. Neither possibility is probable.

¶35 As the circuit court noted, the error occurred infrequently during a two-day trial with "a lot" of testimony

15

from multiple witnesses.  See id.  As the State argues, the error happened twice at most——once during the State's re-direct examination and once when Barnes recalled Sergeant Winterscheidt.  The extent to which Barnes can complain about the second mention of Agent Clauer's observations is obviously questionable considering he is the one who solicited the testimony.

¶36 Finally, the "nature of the defense" was weak.  See id.  Read as a whole, the record does not support Barnes's closing argument that Marciniak set him up and he was merely trying to purchase meth for his girlfriend.  While Barnes had no duty to prove his innocence, the weakness of the defense theory bears on whether the error actually impacted the trial's outcome.  Barnes provided little evidence to support his theory or to otherwise counter the State's strong case.

## IV.  CONCLUSION

¶37 Assuming an error occurred, we conclude it was harmless.  The State produced overwhelming evidence against Barnes.  Additionally, the error occurred infrequently and Barnes's defense did little to counter the State's case.  The guilty verdict rendered in *this* trial was unattributable to the error.

*By the Court.*——The decision of the court of appeals is affirmed.

¶38 ANNETTE KINGSLAND ZIEGLER, C.J. *(concurring).* I join the majority opinion and agree that Barnes' conviction is valid because, assuming error occurred, the error was harmless. I write separately to offer an alternative ground for upholding Barnes' conviction. The conviction is valid because the circuit court did not err in admitting the challenged statements of Sergeant Winterscheidt. His statements of what other officers told him were properly admitted because they were not offered for the truth of the matter asserted and, therefore, were not hearsay. They were offered as relevant evidence to explain Sergeant Winterscheidt's order to stop Barnes as part of law enforcement's investigation of Barnes' involvement in drug trafficking. Accordingly, I respectfully concur.

## I. FACTUAL BACKGROUND[1]

¶39 Barnes' conviction arose out of a controlled drug buy that was facilitated by a confidential police informant, Charles Marciniak. Police provided Marciniak with a white plastic bag containing $7,200 in marked bills to use in buying drugs from Barnes. On the scheduled day, Marciniak and Barnes, who had prearranged a meeting in the Temple Bar parking lot, parked their vehicles going in opposite directions, such that both driver's side windows were up against one another.

---

[1] The majority opinion capably sets out the factual background that led to Barnes' conviction. Therefore, I relate only those facts necessary to understanding the legal principles that form the basis for this concurrence.

1

¶40 Marciniak, who had a serious felony conviction and was awaiting sentence, was to bring $7,200 to the tavern parking lot. Barnes was to bring methamphetamine ("meth").

¶41 Marciniak testified that he threw the white plastic bag of marked bills into Barnes' truck and Barnes then threw back a black box containing meth. That transfer was not video recorded, but other investigators visually observed the transaction and relayed to Sergeant Winterscheidt that Investigator Clauer said he saw the transfer of drugs for money. Sergeant Winterscheidt then gave the order to stop Barnes.

¶42 A transcript of a portion of the trial bears on why law enforcement pursued Barnes. Sergeant Winterscheidt testified that an unnamed officer told him that Investigator Clauer had observed the sale.[2]

> Q. As you drove over to the Temple Bar, what do you recall happening?
>
> A. I remember arriving just as the transaction had been completed. Mr. Marciniak was driving away from the meet location and heard on the radio that the transaction had taken place so I gave the order to take down the suspect.
>
> . . . .
>
> Q. Are you aware of any specific officers that observed the transaction?
>
> A. Yes.
>
> Q. Who was that?
>
> [DEFENSE COUNSEL]: Objection as to foundation, Your Honor, and hearsay.

---

[2] Investigator Clauer was prohibited from testifying during the trial because of a prosecution discovery violation.

. . . .

[STATE]: He opened the door when he asked about did any investigators videotape this.

THE COURT: He opened the door but how does that respond to -- it might make it relevant but how does it make it not hearsay?

[STATE]: Again, it goes to the officer's state of mind at the time. I could lay further foundation for what he did after he was informed of seeing the transaction occur.

THE COURT: Okay, overruled then. You can lay foundation. Can you repeat the question?

Q. When officers surrounded the Temple Bar, were there officers who were able to maintain video -- excuse me, visual surveillance?

[DEFENSE COUNSEL]: Objection, Your Honor. He wasn't there after.

THE COURT: If he knows, he doesn't so overruled.

A. Yes.

Q. You know that there were officers who had visual surveillance on the parking lot at that time?

A. Yes, through our radio communications responding to that I was aware that officers had reported they were in a position at the Temple Bar.

Q. How did you know that the transaction had been completed?

A. Other investigators observing the transaction notified me by radio.

Q. Okay. Do you recall what they said, if anything?

A. I believe the words were something like, it went down, deal is done. Something like that.

Q. Do you know who radioed that to you?

3

A. I don't recall specifically who radioed that to me.

Q. Okay. Are you aware of any specific officers who saw the transaction that Chip Marciniak described to you where he tossed in the buy money and Garland tossed in the black box?

A. Yes.

Q. Who?

A. It was --

[DEFENSE COUNSEL]: Objection, Your Honor, this is hearsay.

THE COURT: [State]?

[STATE]: Again, it goes to officer's state of mind from them getting told that the transaction was done is when officers then moved in to position to stop Garland Barnes.

THE COURT: I'm going to overrule the objection.

. . . .

Q. Sergeant, which investigator saw Chip Marciniak toss in a white plastic bag and Garland Barnes toss in a black box?

[DEFENSE COUNSEL]: Objection, hearsay, lack of foundation.

THE COURT: [State], regarding hearsay?

[STATE]: Again, goes to the officer's state of mind.

THE COURT: So you're not asserting it for the truth of the matter?

[STATE]: No.

THE COURT: Then if it's not asserted for the truth of the matter, I'm going to overrule the objection. It's going to the state [of] mind of the officer. If [defense counsel] wants -- if you want to

4

get a jury instruction on that substantively, I will certainly give it. Go ahead, [State].

Q. What agent saw that?

A. It was DCI Investigator Duane Clauer.

Q. With that information were you then given the code word that the transaction was completed?

A. Yeah, it wasn't a code word. It was just common language to let us know the deal was done.

Q. Once you knew the deal was done, what happened next?

A. After the transaction took place, I was just arriving on the scene. Mr. Barnes backed into the front of sergeant Madden's vehicle and then proceeded out of the parking lot eastbound on Broadway Street.

Q. Were you eventually able to stop him after some time?

A. Yes.

## II. STANDARD OF REVIEW

¶43 The issue is whether the circuit court's admission of Sergeant Winterscheidt's statement that Investigator Clauer observed the drug sale violated Barnes' right of confrontation. "[W]hether to admit or deny evidence rests in the sound discretion of the circuit court, which we will not overturn absent an erroneous exercise of discretion." State v. Novy, 2013 WI 23, ¶21, 346 Wis. 2d 289, 827 N.W.2d 610. We review whether the admission of Sergeant Winterscheidt's statements violated Barnes' confrontation right independently as a question of law. State v. Reinwand, 2019 WI 25, ¶17, 385 Wis. 2d 700, 924 N.W.2d 184.

5

### III. ANALYSIS

¶44 Barnes claims Sergeant Winterscheidt's statement that Investigator Clauer saw the drug sale take place violated his right of confrontation. The right of confrontation arises from the Sixth Amendment of the United States Constitution and Article I, Section 7 of the Wisconsin Constitution.[3]

¶45 Under the Confrontation Clause, out-of-court statements that are both hearsay and testimonial are not admissible against a criminal defendant unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 59 (2004). It is undisputed that Barnes did not have a prior opportunity to cross-examine Investigator Clauer.

¶46 Relevant to deciding this case is the hearsay prong of Crawford. In Crawford, the Supreme Court explained the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 60 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)). By definition, when an out-of-court statement is not offered to prove the truth of the matters asserted, it is not hearsay. "[A] crucial aspect of the Sixth Amendment right to confrontation, pursuant to Crawford, is that it 'only covers hearsay, i.e., out-of-court

---

[3] "'We generally apply United States Supreme Court precedents when interpreting' the Sixth Amendment and the analogous Article 1, Section 7 of the Wisconsin Constitution." State v. Nieves, 2017 WI 69, ¶15, 376 Wis. 2d 300, 897 N.W.2d 363 (quoting State v. Jensen, 2007 WI 26, ¶13, 299 Wis. 2d 267, 727 N.W.2d 518).

6

statements "offered in evidence to prove the truth of the matter asserted."'" State v. Hanson, 2019 WI 63, ¶19, 387 Wis. 2d 233, 928 N.W.2d 607 (quoting United States v. Tolliver, 454 F.3d 660, 666 (7th Cir. 2006)); see also 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 801.302 (4th ed. 2017) ("[O]ut-of-court statements may be offered to prove innumerable relevant propositions apart from the truth of any matters . . . .").

¶47 Hearsay is defined by statute and addressed in numerous court opinions. Wisconsin Stat. § 908.01(3) provides: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." When a statement that might be described as hearsay encompasses an additional statement that also might be described as hearsay, each statement is addressed separately to determine if it is employed for the truth of the matter asserted. Boyer v. State, 91 Wis. 2d 647, 661-62, 284 N.W.2d 30 (1979); Wis. Stat. § 908.05 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in this chapter."). "There is no question that where a particular state of mind of a person is a relevant fact, declarations which indicate its existence are admissible . . . ." Bridges v. State, 247 Wis. 350, 365, 19 N.W.2d 529 (1945) (explaining that "[t]he hearsay rule does not operate, even apart from its exceptions, to render inadmissible every statement repeated by a

7

witness as made by another person. In some instances, the fact that a statement was made, rather than the facts asserted in the statement, is material").

¶48 As a result, "the Confrontation Clause only prohibits the introduction of testimonial hearsay, and hearsay is, by definition, an out of court statement that is 'offered in evidence to prove the truth of the matter asserted.'" State v. Thomas, 2023 WI 9, ¶61, 405 Wis. 2d 654, 985 N.W.2d 87.

¶49 Here, Sergeant Winterscheidt's state of mind was relevant because he was the officer in charge of the ongoing drug trafficking investigation. It was for him to decide whether to order that officers pursue Barnes. He so ordered, not because of the truth of an unnamed officer's telling him that Clauer saw Barnes sell drugs, but because it was Winterscheidt's responsibility as part of the investigative plan once he was told that the sale had occurred. Investigator Clauer's statement to other officers also was part of the investigation wherein he had the role of keeping Marciniak in view and passing along what he thought he saw. Also, the defense that Barnes was the buyer, not the seller, was first mentioned in Barnes' counsel's closing argument at trial. It followed a long and effective cross-examination wherein Barnes' counsel had attempted to show that law enforcement was sloppy in its planning and execution of the investigation of this case. There is nothing in the record to imply that law enforcement was concerned about who was the seller at the time Sergeant Winterscheidt was told the transaction had occurred.

Accordingly, Sergeant Winterscheidt would have ordered officers to pursue Barnes even if what Clauer thought he saw was not correct.

¶50 As we explained in Hanson, "The question is not whether the evidence might be inadmissible hearsay if it is offered to prove the truth of the matter asserted; rather, the question is whether the evidence is offered for a legitimate reason other than for the truth of the matter asserted." Hanson, 387 Wis. 2d 233, ¶25. Furthermore, "when the State offers a statement for a proper non-hearsay purpose . . . it is neither hearsay (evidence law) nor testimonial hearsay (confrontation law)." Id., ¶26 (quoting Blinka, supra ¶46, § 802.302). The evidence at issue in this case was used for a purpose other than the truth of its contents. See, e.g., United States v. Eberhart, 434 F.3d 935, 939 (7th Cir. 2006) (testimony is not for its truth where it is offered "as an explanation of why the investigation proceeded as it did").

¶51 This distinction was brought out at Barnes' trial where the prosecutor asserted that she was not offering Sergeant Winterscheidt's testimony about what he was told that Investigator Clauer had observed for the truth of the matter asserted. But rather, it was offered to show Sergeant Winterscheidt's state of mind about why he took subsequent steps in this drug trafficking investigation. In permitting the testimony, the circuit court explained, "It's going to the state of mind of the officer. If [defense counsel] wants -- if you want to get a jury instruction on that substantively, I will

9

certainly give it." Barnes did not ask for the jury instruction that the circuit court offered.

¶52 In sum, the testimony that Investigator Clauer saw the sale occur is relevant to Sergeant Winterscheidt's state of mind because it caused him to order Barnes be pursued and stopped as part of his investigation of drug trafficking. When Sergeant Winterscheidt gave the order, "officers then moved into position to stop Garland Barnes." It did not matter whether the statement was true or not. What mattered was that the investigative plan called for Sergeant Winterscheidt to order that Barnes be stopped when he was told that Investigator Clauer saw the sale occur. "[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement." Anderson v. United States, 417 U.S. 211, 220 n.8 (1974). Here, the prior statement was that Investigator Clauer saw the sale occur. It is relevant because it caused Sergeant Winterscheidt to order law enforcement personnel to move forward with their prior plan. It does not matter whether the statement he received was correct. Therefore, the circuit court did not erroneously exercise its discretion in admitting the testimony, which was offered for a permissible purpose. Reinwand, 385 Wis. 2d 700, ¶35.

## IV. CONCLUSION

¶53 Barnes' conviction is valid because the circuit court did not err in admitting the challenged statements of Sergeant Winterscheidt. His statements of what other officers told him were properly admitted because they were not offered for the

10

truth of the matter asserted and, therefore, were not hearsay. They were offered as relevant evidence to explain Sergeant Winterscheidt's order to stop Barnes as part of law enforcement's investigation of Barnes' involvement in drug trafficking.

¶54 For the foregoing reasons, I respectfully concur.

¶55 I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.